**Le'Netta W. STONE, Plaintiff,**

v.

**Togo D. WEST, Jr., Secretary, Department of Veteran Affairs, Defendant.**

No. 99–72153.

United States District Court, E.D. Michigan, Southern Division.

March 21, 2001.

Le'Netta Stone Pro Per, River Rouge, MI, for plaintiff.

Karen Gibbs, AUSA, Detroit, MI, for defendant.

### *OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

#### I. *INTRODUCTION*

On April 29, 1999, Plaintiff Le'Netta W. Stone commenced this Title VII discrimination suit against her employer, the Department of Veterans Affairs, alleging that Defendant imposed unlawful terms and conditions upon her employment and subjected her to harassment following her request that her work schedule at the Veterans Administration ("VA") Hospital in Ann Arbor, Michigan be changed to accommodate her religious beliefs. Although Plaintiff cites a variety of examples of allegedly discriminatory conduct by her employer, her principal claim is that Defendant unlawfully failed to provide her with a work schedule that would have allowed her to observe her Sabbath as a Seventh Day Adventist, spanning from Friday at sundown until Saturday at sundown. In her *pro se* complaint, Plaintiff asserts a claim of religious discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

By motion filed on April 17, 2000, Defendant now moves for dismissal of Plaintiff's claim on the ground that she failed to timely exhaust her administrative remedies. Alternatively, Defendant seeks an award of summary judgment in his favor, arguing that Plaintiff has failed to adduce evidence in support of the various elements of her discrimination claim. For her part, Plaintiff submitted papers on March 30, 2000 styled as a "motion to continue case." While neither party has directly responded to the other's motion, Plaintiff has sent two letters to the Court addressing various aspects of the "failure to exhaust" issue.[1]

On June 8, 2000, the Court heard oral argument on the parties' motions. Having considered the arguments presented at this hearing, and having reviewed the briefs and supporting materials submitted by the parties, the Court is now prepared to rule on these motions. This Opinion and Order sets forth the Court's rulings.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Plaintiff's Initial Employment with Defendant

Plaintiff began her employment with Defendant on August 6, 1995. She was hired as a part-time medical ward clerk at the Ann Arbor VA Hospital, reporting to supervisor Sharon Burke–Johnson in the hospital's Medical Administration Service ("MAS"). Plaintiff's duties as a ward clerk included typing, answering phones, maintaining patient charts and records, filing, communicating with nurses, and ensuring the proper level of supplies within the

ward. Initially, Plaintiff worked in the Medical Intensive Care Unit ("MICU") and the Thoracic Intensive Care Unit ("TICU"). However, she was not designated for employment in a particular ward or unit, and she potentially could be assigned to work anywhere in the hospital.

Plaintiff initially was hired for the afternoon or second shift, which ran from 3:30 p.m. to midnight. During her job interview, Plaintiff was told that she would primarily be assigned to work Saturdays, Sundays, and Mondays, though she occasionally worked Tuesdays and Wednesdays as well. Her Saturday shift conflicted with her Sabbath as a Seventh Day Adventist, as she was required to report for work before sundown on Saturday. However, when she interviewed for the position of part-time ward clerk, she did not advise Defendant of her religious beliefs, nor did she request that these beliefs be accommodated by giving her a work schedule that would not conflict with her Sabbath.

### B. Plaintiff's Requests for Scheduling Accommodations

At her deposition, Plaintiff identified October of 1995 as the first time that she advised her supervisor, Ms. Johnson, of her religious beliefs and sought a scheduling accommodation. At that time, she asked for a particular Saturday off so that she could attend a youth conference. Plaintiff testified that she informed Johnson that her request for time off was motivated by her religious beliefs. The record does not reveal whether this request was granted.[2]

---

1. It is not clear whether either of these letters was copied to Defendant. Indeed, it does not appear that Plaintiff ever served Defendant with a copy of her March 30, 2000 motion. When advised of this, the Courtroom Deputy Clerk of this Court provided Defendant's counsel with a copy of Plaintiff's motion. The Court cautions Plaintiff that all papers filed with this Court must also be served upon Defendant.

2. As one of many examples of his misrepresentation of the record, Defendant states in

the brief in support of his motion that Plaintiff "requested one day off on her Sabbath to attend her grandfather's birthday, and her request was granted." (Defendant's Motion, Br. in Support at 3.) In fact, while the day in question was also her grandfather's birthday, Plaintiff repeatedly emphasized at her deposition that she sought the time off in order to attend a religious event, and not to celebrate a birthday. (Plaintiff's Dep. at 21–23.) Moreover, contrary to Defendant's assertion, Plaintiff did not indicate whether her request was granted.

In early 1996, Defendant granted Plaintiff's request that she be placed into a full-time ward clerk position. At about the same time, on January 10, 1996, Plaintiff sent an electronic mail message and attached memo to Johnson, requesting that her work schedule be changed to Sundays through Thursdays so that she could attend church, and offering to produce a letter from her pastor if necessary. (Administrative Record ("AR") at 1–32.) Johnson promptly responded by e-mail that she had read Plaintiff's memo, and that she would "try to accommodate your request." (*Id.*) [3]

However, Defendant did not grant Plaintiff's request for a scheduling change. Instead, until Defendant was able to fill Plaintiff's former part-time position, she continued to work on Saturdays, Sundays, and Mondays, with Tuesdays and Wednesdays added to achieve a temporary full-time schedule. During this interim period, Plaintiff submitted computerized leave requests for three Saturdays off during the month of March, and was told that she would have to pick only one of these Saturdays. Plaintiff failed to choose a date, however, and so these leave requests were not granted. More generally, Plaintiff was advised that she would have to continue working on weekends unless she could find another clerk who was willing to work a particular Saturday in exchange for Plain-

tiff taking that clerk's shift on another weekday.

In the spring of 1996, Plaintiff assumed a full-time schedule of Mondays through Fridays, 3:30 p.m. until midnight. Again, this schedule failed to fully accommodate Plaintiff's desire not to work on her Sabbath. Thus, Plaintiff continued to send e-mails to Johnson and to Barbara Shepherd, the head ward clerk and Johnson's supervisor, asking for a Sunday–Thursday schedule and requesting a meeting with Johnson and Shepherd to discuss the matter. This meeting apparently never occurred.

Throughout this time, Plaintiff's supervisor, Sharon Burke–Johnson, apparently sent daily devotional or inspirational e-mail messages to Plaintiff and various other ward clerks. On May 13, 1996, shortly after another e-mail from Plaintiff requesting a meeting to discuss her scheduling concerns, Johnson's daily devotional message included a quote from the biblical book of Exodus stating, "Remember to observe the Sabbath as a holy day." (AR at 1–120.) Her e-mail message went on to discuss the importance of celebrating the Sabbath. (*Id.*) Johnson's e-mail concluded, "Rearrange this week's schedule to leave next Sunday free for rest and worship." (*Id.*) [4]

Although Plaintiff's schedule was not modified to give her both Fridays and

---

**3.** In an affidavit in support of Defendant's motion, Johnson now claims that "at no time did [Plaintiff] advise me that her schedule conflicted with her religious beliefs, practices, and Sabbath." (Defendant's Motion, Ex. 1, Johnson Aff. at ¶ 4.) This assertion, however, seems to be contradicted by Plaintiff's e-mails to Johnson in January and February of 1996, which expressly mention her desire to be "given a schedule which would allow me to attend church." (AR at 1–32.) Moreover, elsewhere in her affidavit, Johnson states that Plaintiff was designated as a "floating" clerk—that is, one who is assigned to different wards depending on staffing needs on a given day—because "assignment to a permanent ward was precluded by the schedule [Plaintiff] requested to accommodate ... her religious beliefs." (Johnson Aff. at ¶ 6.)

**4.** In his motion and brief in support, Defendant does not even acknowledge this e-mail message, let alone attempt to explain it. During the EEOC proceedings, Johnson apparently explained that this "message was part of a daily devotion that she sent to anyone who requested it," and that Plaintiff was among those who had requested this daily message. (AR at 1–10.) Yet, leaving aside the wisdom of a federal government supervisor using a governmental computer system to send daily biblical quotes and religious messages to employees who report to her, the Court fails to see how Johnson's May 13, 1996 e-mail is rendered any less significant, for purposes of Plaintiff's present claim of religious discrimination, merely because it was sent to other employees in addition to Plaintiff.

Saturdays off, Defendant did accommodate other requests by Plaintiff over the next several months that her schedule be adjusted so that she could attend classes. For example, at some point in mid–1996, Plaintiff enrolled in classes held on Monday and Wednesday evenings, and she changed from her previous Monday–through–Friday schedule to working a 12–hour day shift on Sunday, a 12–hour evening shift on Tuesday, and 8–hour evening shifts on Thursday and Friday. (AR at 1–40.) In December of 1996, her class schedule changed, and her work schedule correspondingly changed to 12–hour shifts on Sunday and Monday and 8–hour evening shifts on Wednesday and Friday. Plaintiff apparently agreed to these scheduling changes.

In October of 1996, the hospital underwent a reorganization, and the management of ward clerks was transferred from MAS to Patient Care Services ("PCS"), supervised by the hospital's nursing staff. Upon this transfer, Plaintiff renewed her request for a "full accommodation" of her desire not to work on her Sabbath, from sundown on Friday until sundown on Saturday. (AR at 1–47.) In an October 1, 1996 letter setting forth her request, Plaintiff suggested several alternative solutions, such as transfer to a shift or department that did not operate on Friday or Saturday nights, or allowing her to leave the job on Friday afternoons shortly before sundown. (*Id.*)

Plaintiff's initial supervisor within PCS, Jane Vanderkolk, viewed Plaintiff's request for a full accommodation with some hesitation. As Vanderkolk noted in her testimony before the investigator assigned to handle Plaintiff's Equal Employment Opportunity ("EEO") complaint, Plaintiff was hired to work the afternoon shift, yet she had requested Friday and Saturday evenings off to observe her Sabbath, plus two other evenings off to attend classes, leaving only three days per week that

Plaintiff could work the second shift. (AR at 1–256–58.) Vanderkolk testified that she discussed this matter with Plaintiff, and that Plaintiff expressed her willingness to continue working on Friday evenings, so long as she could still have Saturdays off. (*Id.* at 1–257–58.)

In late December of 1996, Joan Wheeler replaced Joan Vanderkolk as Plaintiff's supervisor. Shortly thereafter, Plaintiff sent Wheeler an e-mail advising her of Plaintiff's ·prior request for accommodation of her religious beliefs. Wheeler did not immediately grant the scheduling accommodation sought by Plaintiff, but allowed Plaintiff to take three consecutive Fridays off in February of 1997 as leave time.[5]

As discussed below, Plaintiff met with an EEO counselor in February of 1997 in an effort to attain a schedule that fully accommodated her observance of her Sabbath. Plaintiff then filed a formal complaint of religious discrimination on March 6, 1997. Soon thereafter, in May of 1997, Defendant fully accommodated Plaintiff's desire not to work on her Sabbath.

### C. Plaintiff's Allegations of Harassment

Apart from Plaintiff's claim that Defendant failed to accommodate her religious beliefs by adjusting her schedule, Plaintiff also alleges that she was subjected to various forms of harassment following her request for this scheduling accommodation. First, Plaintiff contends that her supervisors gave her unduly poor evaluations and wrote her up for several "petty" offenses, including overuse of sick leave and alleged errors in documenting patient records, transcribing doctors' orders, and entering lab requests in the computer. Plaintiff challenges the factual basis for many of these alleged errors, asserting that she was merely adhering to the standard practice followed by all ward clerks. Plaintiff also alleges that her supervisor, Sharon

---

5. As discussed below, Plaintiff was charged with leave without pay ("LWOP") for these days off, despite her contention that she had enough available leave time to cover these absences.

Burke–Johnson, once told her that she reviewed Plaintiff's work after she left each night to "see what you're doing wrong." (Plaintiff's Dep. at 82.)

Next, Plaintiff alleges that, at some point in mid–1996, she was removed from her permanent assignment to the MICU and designated as a "floater" with responsibilities to cover multiple units. More generally, she claims that she was given more onerous work assignments in apparent retaliation against her efforts to obtain a scheduling accommodation. Plaintiff further contends that she was erroneously charged with using annual leave time for certain dates at the end of September of 1996, despite having obtained verification from a physician that this time should be designated as sick leave. Accordingly, when, as noted earlier, Plaintiff took three days off in February of 1997 to observe her Sabbath, Defendant concluded—wrongly, in Plaintiff's view—that Plaintiff lacked sufficient annual leave to cover these absences, and Plaintiff was assigned an "LWOP" status for these three dates.

Finally, Plaintiff alleges that Johnson once referred to her as a "bitch." She also claims that union and EEO officers within the VA Hospital failed to take proper action on her complaints of discrimination, and she attributes this, in part, to these enforcement officers' friendships with her supervisors. Plaintiff alleges that these instances of harassment detrimentally affected her health, leading to high blood pressure and increased stress.

### D. Procedural Background

Plaintiff consulted with an EEO counselor at the VA Hospital on February 10, 1997, seeking a "[s]chedule that allows for church activities on Friday and Saturday." (AR at 1–113.) On March 6, 1997, Plaintiff filed a formal complaint of employment discrimination, citing alleged incidents of religious discrimination and harassment beginning in January of 1996. (AR at 1–

128.) On June 22, 1998, a final agency decision was issued, concluding that Plaintiff had not been subjected to discrimination or harassment on account of her religion. (AR at 1–1–17.) In the text of this decision, Plaintiff was expressly advised that she could file an appeal with the Equal Employment Opportunity Commission ("EEOC") within 30 days of receiving the agency's decision, or that she could commence a civil suit within 90 days if she elected not to pursue an administrative appeal. (AR at 1–16–17; *see also* 29 C.F.R. §§ 1614.402(a), 1614.408(a).)

Plaintiff chose to appeal to the EEOC. She received the final agency decision on either July 6 or July 7, 1998.[6] Consequently, under the governing EEOC regulations, she was required to file her administrative appeal within 30 days, *see* 29 C.F.R. § 1614.402(a), or by August 5 or 6, 1998. The EEOC records, however, indicate that Plaintiff did not file her administrative appeal until August 25, 1998, approximately 20 days after the filing deadline. (AR 1–26.)

Despite this administrative appeal, Plaintiff was authorized under the EEOC regulations to commence a civil suit if the EEOC failed to decide her appeal within 180 days after its filing. *See* 29 C.F.R. § 1614.408(d). Accordingly, on April 29, 1999, Plaintiff brought the present action, asserting a claim of religious discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

Once such a civil suit is brought, the EEOC regulations direct that any pending administrative appeal must be dismissed. *See* 29 C.F.R. § 1614.410. The EEOC ultimately did so, albeit not at all promptly. Specifically, on March 14, 2000, almost a year after Plaintiff brought this suit, the EEOC issued a decision dismissing Plaintiff's appeal, on the ground that the EEOC regulations preclude Plaintiff from simultaneously pursuing both administrative

---

**6.** The record is somewhat unclear on this point. The return receipt form is stamped with the date July 6, 1998, but Plaintiff wrote the date "7/7/98" next to her signature on this form. (AR 1–96.)

**978**

and judicial avenues of relief. In a footnote, the EEOC observed that Plaintiff's administrative appeal could also have been dismissed as untimely brought.

On April 17, 2000, Defendant filed the present motion to dismiss or for summary judgment, arguing (i) that Plaintiff's untimely administrative appeal divests this Court of jurisdiction over her Title VII claim, and (ii) that Plaintiff's claim of religious discrimination lacks any evidentiary basis. Although Plaintiff has not responded to this motion, she has filed a March 30, 2000 "motion to continue case," in which she sets forth the allegations in support of her claim and provides extensive documentation purportedly bearing on these allegations. Plaintiff also sent correspondence to the Court on April 21 and April 28, 2000, enclosing additional documents relating to her administrative appeal. Finally, on June 8, 2000, the Court heard oral argument on the parties' motions.

### III. *ANALYSIS*

#### A. The Standards Governing the Parties' Motions

■ In the motion presently before the Court, Defendant first moves for dismissal of Plaintiff's complaint pursuant to Fed. R.Civ.P. 12(b)(1), arguing that this Court lacks jurisdiction by virtue of Plaintiff's alleged failure to timely exhaust her administrative remedies. A motion brought under Rule 12(b)(1) may mount either a facial or a factual attack on the subject matter jurisdiction of the Court. *Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir.1990). A facial attack "merely questions the sufficiency of the pleading," and, in resolving such a jurisdictional challenge, the Court "takes the allegations in the complaint as true." 922 F.2d at 325. Alternatively, if the Court is confronted with a factual controversy as to the jurisdictional basis for the case, it must "weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist." 922 F.2d at 325. In this latter situation, the Court "has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." 922 F.2d at 325. Regardless of the nature of the attack, "[w]here subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Regional Transit Auth.,* 895 F.2d 266, 269 (6th Cir.1990).

In the alternative, Defendant seeks summary judgment in his favor on Plaintiff's discrimination claim. Under the relevant Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.[7] According to the *Celotex* Court:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

---

**7.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure,* § 2727, at 33 (1993 Supp.).

which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

\* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

\* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

\* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also Nernberg v. Pearce,* 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in resolving Defendant's motion for summary judgment.

Finally, as noted earlier, Plaintiff has filed what she has termed a "motion to continue case." Because this motion neither argues nor shows that Plaintiff is entitled to a judgment in her favor as a matter of law, it is manifest that the Court may not award summary judgment on the basis of this motion. Rather, the Court will treat this submission as a response to Defendant's motion.

### B. The Apparent Procedural Deficiencies in Plaintiff's Administrative Appeal Do Not Bar This Suit.

As the first argument in support of his motion, Defendant contends that Plaintiff's allegedly untimely appeal during the course of the administrative proceedings divests this Court of jurisdiction to hear Plaintiff's Title VII claim. In particular, Defendant points to Plaintiff's apparent failure to meet the 30–day deadline for filing an administrative appeal. Defendant's argument, however, both misstates the governing law and inaccurately portrays Plaintiff's efforts during the administrative proceedings.

■ As an initial matter, while Defendant presents this argument as a jurisdictional challenge, it has long been recognized that the time limits set forth in Title VII and its implementing regulations do not establish jurisdictional prerequisites, but rather are merely "timing requirement[s] similar to a statute of limitations." *Truitt v. County of Wayne,* 148 F.3d 644, 646–47 (6th Cir.1998); *see also Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982); *Benford v. Frank,* 943 F.2d 609, 612 (6th Cir.1991). More specifically, in *White v. Bentsen,* 31 F.3d 474, 475 (7th Cir.1994), the Seventh Circuit expressly ruled that the time limit for filing an administrative appeal is not jurisdictional. Thus, Defendant's challenge to this Court's jurisdiction is wholly without merit.

■ Because the various administrative deadlines are akin to a statute of limitations, they are subject to doctrines such as waiver, estoppel, and equitable tolling. *See Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95–96, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990); *Truitt,* 148

F.3d at 646–47; *White*, 31 F.3d at 475. Indeed, Defendant presumably would have recognized this, had he properly referred to the EEOC regulations that had long been in effect by the time of Plaintiff's administrative proceedings.[8] Specifically, the governing EEOC regulations expressly state that "[t]he time limits in [29 C.F.R. part 1614] are subject to waiver, estoppel and equitable tolling." 29 C.F.R. § 1614.604(c).

Although neither party discusses (or even mentions) these doctrines, two of them arguably come into play here. First, as discussed earlier, in its recent March 14, 2000 decision dismissing Plaintiff's administrative appeal, the EEOC noted that this appeal apparently had been untimely filed outside the regulatory 30–day limit. The agency, however, elected not to dismiss Plaintiff's appeal on this ground, and instead dismissed the appeal as precluded by Plaintiff's subsequent filing of a civil suit. Thus, the EEOC arguably has waived any claim that Plaintiff's administrative appeal was untimely brought.

■ Next, and more importantly, the administrative record suggests that Plaintiff might well have substantially complied with the 30–day deadline, notwithstanding a possible technical defect in her filing. The statement submitted by Plaintiff in support of her administrative appeal is dated August 4, 1998, (AR at 1–25), and the "Notice of Appeal" form she filed with the EEOC likewise is dated August 4, 1998. If she actually mailed these documents on August 4, 1998, her appeal would have been timely. *See* 29 C.F.R. § 1614.604(b) ("A document shall be

deemed timely if it is . . . postmarked before the expiration of the applicable filing period."). Presumably, the EEOC determined that Plaintiff did not do so, as it treated Plaintiff's appeal as filed on August 25, 1998. (AR at 1–26.) Nothing in the administrative record sheds light on this discrepancy.

However, a document attached to Plaintiff's complaint, as well as documents she recently submitted to the Court, provides a possible explanation of the events surrounding the filing of Plaintiff's administrative appeal. Attached to Plaintiff's complaint is a September 21, 1998 letter from Plaintiff to the EEOC, inquiring whether the agency received an Express Mail package she sent on August 4, 1998. Similarly, among the papers Plaintiff recently submitted to the Court is an Express Mail receipt for a package she sent to the EEOC on August 4, 1998.[9] Apparently, this package contained the final decision being appealed and Plaintiff's statement challenging this decision, but did not include the EEOC "Notice of Appeal" form. Under EEOC regulations, this "EEOC Form 573" is necessary to commence an appeal, while the complainant's statement in support of the appeal need only be submitted within 30 days of initiating the appeal. 29 C.F.R. § 1614.403(a), (d). Evidently, then, Plaintiff submitted the relevant documents in the wrong order, first her statement and then the Notice of Appeal form, several days later. Because the latter document is the significant one for purposes of determining the date of appeal, the EEOC concluded that Plaintiff's appeal was filed on August 25, 1998, and not on August 4, 1998.[10]

8. In his brief, Defendant cites regulations at 29 C.F.R. § 1614.201 *et seq.* (Defendant's Br. at 9–10.) These regulations, however, were removed from the Code of Federal Regulations back in 1995 as "obsolete," since they were superseded by final EEOC regulations issued in 1992. *See* 60 Fed.Reg. 43,371–01 (1995).

9. Plaintiff also has provided a certified mail receipt for a package she sent to the Department of Veteran Affairs, Office of General Counsel on August 4, 1998. This receipt indi-

cates that this package was delivered on August 10, 1998. Other VA correspondence in the administrative record confirms that Defendant's Office of General Counsel received this package, containing a "seven-page statement dated August 4, 1998," on August 10, 1998. (AR at 1–36.)

10. The Court hastens to add that this version of events is largely conjectural. Plaintiff has provided only documentation, without explaining what actually occurred. For his part, Defendant completely ignores any sug-

Under these circumstances, the Court concludes that the doctrine of equitable tolling applies here, and that this doctrine overcomes Plaintiff's defective filing of her administrative appeal. As explained by the Supreme Court, the courts have "allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period." *Irwin*, 498 U.S. at 96, 111 S.Ct. at 457–58 (footnote with citations omitted). This apparently is what occurred here, albeit in the administrative rather than the judicial context. Plaintiff actively pursued her administrative remedies by sending a statement to the EEOC on August 4, 1998, within the 30–day time limit, but merely omitting the "Notice of Appeal" form needed to commence an appeal. Further, Plaintiff cured this defect within a few days, submitting the EEOC form on August 25, 1998.

 In addition, the factors identified by the Sixth Circuit as bearing upon the equitable tolling inquiry support the application of this doctrine here. These factors include: (1) lack of notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) the plaintiff's reasonableness in remaining ignorant of the particular requirement. *Truitt*, 148 F.3d at 648. Although Plaintiff was notified of the relevant filing deadlines, and although she does not claim ignorance of these requirements, she was diligent in pursuing her administrative appeal, and simply failed to adhere to all of the relevant procedural guidelines. Moreover, Defendant can hardly identify any prejudice here, where Plaintiff's statement on appeal admittedly was received on August 10, 1998, just a few days after it was mailed, and where the very first words in this statement were "Appeal to Final Agency Decision." (AR at 1–19.) Surely, neither Defendant nor the EEOC can

claim any lack of notice or confusion as to Plaintiff's timely-stated intention to pursue an administrative appeal.

Finally, while Plaintiff admittedly has not expressly argued that she should be treated as having timely filed her administrative appeal, or that any defects in filing should be forgiven, the Court cannot help but note Defendant's utter failure to even acknowledge that Plaintiff might be able to make a colorable argument as to the timeliness of her appeal. Instead, Defendant seeks to rest solely upon a wholly "by-the-numbers" argument that Plaintiff failed to exhaust her administrative remedies, without any regard for the particular facts and circumstances presented here. This sort of half-hearted effort is insufficient to sustain Defendant's motion to dismiss, where the record casts substantial doubt, to say the least, upon Defendant's assertion that Plaintiff somehow slumbered on her rights. Therefore, the Court finds that Defendant is not entitled to the dismissal of Plaintiff's complaint for failure to exhaust administrative remedies.

## C. Plaintiff's Claim of Religious Discrimination

Next, turning to the merits of Plaintiff's claim of religious discrimination, Defendant argues that he is entitled to an award of summary judgment in his favor on this claim. In particular, Defendant argues that Plaintiff has failed to establish a prima facie case of discrimination, and that, even if she had, she has not produced sufficient evidence to rebut Defendant's statement of the legitimate reasons for his actions. Defendant further contends that he reasonably accommodated Plaintiff's request for a scheduling change, and that any further accommodation would have imposed undue hardship on Defendant. The Court agrees that Plaintiff's claim suffers from certain fatal evidentiary flaws, albeit not the ones suggested by Defendant.

gestion in the record that Plaintiff might have at least attempted to timely file her administrative appeal.

### 1. Analysis of Plaintiff's Claim Under the *McDonnell Douglas* Standard

In his motion, Defendant proposes two different frameworks for analyzing Plaintiff's claim of religious discrimination. First, Defendant suggests that Plaintiff's claim be tested under the tripartite burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Viewing Plaintiff's claim within this framework, Defendant contends that Plaintiff has failed to establish a prima facie case of religious discrimination because she has not identified any similarly situated employees outside her protected class—that is, the protected class of Seventh Day Adventists who wish to observe their Sabbath—who received more favorable treatment. *See Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992).

Admittedly, Plaintiff's showing here falls far short of the standard set forth in *Mitchell.* Plaintiff merely alleges that others were accommodated while she was not, without any effort to meet her evidentiary burden of showing that these other employees were similarly situated in all respects. *See Mitchell,* 964 F.2d at 583. As stated above, this burden cannot be met merely by submitting a stack of documents to the Court, as Plaintiff has done, and inviting the Court to sift through them in an effort to find support for Plaintiff's allegations. Rather, it is Plaintiff's obligation to direct the Court's attention to such supporting evidence of comparable employees who were treated differently, and Plaintiff has failed to do so.[11]

Nevertheless, as Defendant recognizes, Plaintiff need not engage in this "similarly situated" inquiry if she can produce *direct* evidence of unlawful discrimination. *See Shah v. General Electric Co.,* 816 F.2d 264, 267 (6th Cir.1987); *Perkins v. Regents of University of Michigan,* 934 F.Supp. 857, 863 (E.D.Mich.1996); *Venters v. City of Delphi,* 123 F.3d 956, 972–74 (7th Cir.1997). To establish a claim of intentional discrimination through this direct route, Plaintiff must show that (1) she was a member of a protected class, (2) she was subject to an adverse employment action, and (3) the person responsible for the employment decision was (a) predisposed to discriminate against persons in the protected class and (b) actually acted on that predisposition in the employment action at issue. *Perkins,* 934 F.Supp. at 863.

In dismissing this possible avenue of proof out-of-hand, Defendant utterly fails to account for the May 13, 1996 e-mail message sent to Plaintiff by her supervisor, Sharon Burke–Johnson, in which Johnson specifically discusses the Sabbath, quotes a biblical passage calling for observance of the Sabbath, and then calls upon her employees to "leave next Sunday free for rest and worship." (AR at 1–120.) This e-mail followed shortly after Plaintiff had sought a meeting among herself, Johnson, and Barbara Shepherd to discuss her request for a religious accommodation. To compound the problem, no such meeting ever occurred, and the record does not reflect that Johnson ever explained to Plaintiff why it was not possible to grant the scheduling accommodation she sought.

---

11. Arguably, Plaintiff can point to herself as the relevant "similarly situated" employee. In particular, the unrefuted record shows that Plaintiff's schedule was changed, on more than one occasion, so that she could attend classes. This scheduling change involved giving Plaintiff two nights off, and extending her working hours on other days to compensate for the lost days. Yet, when Plaintiff sought a similar accommodation of her desire to observe her Sabbath, she was given only a partial accommodation—either Friday or Saturday, but not both. This tends to undercut

Defendant's contention that it was not possible to fully accommodate Plaintiff's religious beliefs.

On the other hand, the Court recognizes that Plaintiff made accommodation a great deal more difficult by requesting that her employer accommodate, not just her religious beliefs, but these beliefs *plus* her class schedule. Clearly, Plaintiff herself undermined her effort to avoid working on her Sabbath by also seeking not to work on other weekdays, which otherwise would have been available as substitutes for Fridays and Saturdays.

The Court finds that Johnson's e-mail, while falling considerably short of an unequivocal "smoking gun," nonetheless gives rise to an issue of fact as to whether Johnson acted on a predisposition to discriminate against Plaintiff's exercise of her religion, particularly where Defendant has utterly failed to offer evidence that might tend to lessen the damaging impact of Johnson's facially discriminatory remarks.[12]

## 2. Analysis of Plaintiff's Claim Under the Standard Adopted in *Smith v. Pyro Mining Company*

Next, Defendant cites the Sixth Circuit's decision in *Smith v. Pyro Mining Co.*, 827 F.2d 1081 (6th Cir.1987), as setting forth the relevant standards for deciding a claim of religious discrimination. *Smith*, like this case, involved an employee's efforts to adjust his schedule in order to accommodate his religious belief that he must not work on his Sabbath (in that case, Sunday). The *Smith* Court held that a plaintiff establishes a prima facie case of religious discrimination by showing: (1) that she holds a sincere religious belief that conflicts with an employment requirement; (2) that she has informed her employer about this conflict; and (3) that she suffered an adverse employment action as a result of her failure to comply with the conflicting requirement. *Smith*, 827 F.2d at 1085.

Defendant largely concedes that Plaintiff has established a prima facie case under this standard, at least as of January of 1996, when she first requested a change in her work schedule to accommodate her religious beliefs. Defendant's sole challenge rests on the untenable assertion, based principally on the affidavit of Sharon Burke-Johnson, that Plaintiff failed to provide notice of the conflict between her religious beliefs and her work schedule. Yet, as noted earlier, Plaintiff sent electronic mail messages to Johnson in January and February of 1996 in which she expressly requested "a schedule which would allow me to attend church," and in which she offered to obtain "a letter from my pastor" to justify her request. (AR at 1–32.) Indeed, Johnson's own affidavit contradicts her assertions concerning lack of notice, as she states that Plaintiff was designated as a "floating" clerk—that is, one who is assigned to different wards depending on staffing needs on a given day—because "assignment to a permanent ward was precluded by the schedule [Plaintiff] requested to accommodate ... her religious beliefs." (Burke-Johnson Aff. at ¶ 6.) Thus, Defendant's claim of lack of notice is wholly without merit. Apart from this challenge, Defendant apparently presumes that Plaintiff otherwise has established her prima facie case under the *Smith* standard.[13]

Assuming that a prima facie case has been established, "the burden shifts to the employer to prove that it cannot reasonably accommodate the employee without incurring undue hardship." *Smith*, 827 F.2d at 1085; *see also* 29 C.F.R. § 1605.2. This reasonableness inquiry must be conducted on a case-by-case basis; "what may be a reasonable accommodation for one employee may not be reasonable for another." *Smith*, 827 F.2d at 1085. For example, in this case, it obviously is of vital importance that Defendant maintain proper staffing levels in the VA Hospital units, particularly in the intensive care units where Plaintiff often worked. Defendant's motion focuses primarily on this "reasonable accommodation" element of the stan-

---

**12.** Of course, this direct evidence of a predisposition to discriminate encompasses only those challenged employment decisions that were made during the time Johnson was Plaintiff's supervisor. Plaintiff has identified no similar direct evidence of discrimination as to her subsequent supervisors, Jane Vanderkolk and Joan Wheeler. Moreover, as discussed below, Plaintiff still faces substantial obstacles on the "adverse employment action" prong of her prima facie case.

**13.** As discussed below, the Court does not share this view, but instead finds that Plaintiff has failed as a matter of law to establish the "adverse employment action" prong of her prima facie case.

dard announced in *Smith.* The Court, however, cannot agree that Defendant has established as a matter of law that the hospital's efforts at accommodation were reasonable, and that any further efforts would have imposed undue hardship.

In an effort to show that reasonable efforts were made, Defendant again relies chiefly on the affidavit of Sharon Burke–Johnson. Yet, this affidavit simply fails to identify the specific difficulties the VA Hospital would have faced if Plaintiff were given a schedule that did not require her to work on her Sabbath. At best, Johnson's affidavit establishes (a) the importance of proper staffing in the hospital ICUs (a matter which the Court readily recognizes, and which Plaintiff presumably does not contest), and (b) that, in the event that Plaintiff or any other employee failed to report for work as scheduled on a given day, the hospital was forced to incur overtime expenses for substitute workers, and occasionally to double-up the ward clerks to ensure that all units were covered. This last point, however, concerns only last-minute scheduling changes or one-time failures to report for work, and does not in any way address the permanent scheduling change sought by Plaintiff.

The Court recognizes that such permanent changes cannot be achieved overnight. Rather, to make such an accommodation, it would have been necessary to identify employees who could work the shifts that Plaintiff wished to vacate. However, Defendant has utterly failed to point to any evidence in the record indicating that Plaintiff's supervisors actively sought out, or aided Plaintiff in seeking out, employees who were willing to assume Plaintiff's shifts during her Sabbath, or that such efforts simply took some time or failed to produce any opportunities to accommodate Plaintiff's scheduling request. It is not enough merely to point generally to the difficulties inherent in changing employee schedules. Nor, under the governing EEOC regulations, is it enough to

leave it to the employee to find another worker who is willing to swap shifts. *See* 29 C.F.R. § 1605.2(d)(i) ("The Commission believes that the obligation to accommodate requires that employers and labor organizations facilitate the securing of a voluntary substitute with substantially similar qualifications.").

Instead, Defendant must produce evidence that the hospital administration made an effort to accommodate Plaintiff, and that difficulties in fact arose in the course of this effort. Even then, "[i]f the employer's efforts fail to eliminate the employee's religious conflict, the burden remains on the employer to establish that it is unable to reasonably accommodate the employee's religious beliefs without incurring undue hardship." *Smith,* 827 F.2d at 1085. Defendant offers nothing but conjecture on this point. Presumably, if Defendant truly made the effort to accommodate Plaintiff, it would have been an easy task to produce evidence of such efforts, as well as any resulting hardship. Tellingly, Defendant has not done so.

Indeed, certain evidence in the record permits the inference that such an accommodation was possible. As noted earlier, Defendant was able to accommodate Plaintiff's requests that her schedule be adjusted to allow her to attend classes. It is not apparent why this sort of accommodation should have been easier to achieve than the religious accommodation also sought by Plaintiff.[14] Moreover, Defendant ultimately was able to fully accommodate Plaintiff's desire not to work on her Sabbath. Yet, nothing in the record discloses why this accommodation would have imposed an undue hardship between January of 1996 and April of 1997, but then became achievable in May of 1997. The only changed circumstance to be found in the record was Plaintiff's filing of an EEO complaint in March of 1997, shortly before her scheduling request was fully granted. In short, the evidence fails to establish as

---

**14.** This is not to say, of course, that Plaintiff's simultaneous demands for two sorts of sched-

uling accommodations did not make the task more difficult for her supervisors.

a matter of law that Defendant made reasonable efforts to accommodate Plaintiff.

 Nevertheless, backing up one step in the *Smith* analysis, the Court finds that Defendant has too readily conceded one of the elements of Plaintiff's prima facie case—namely, the requirement that she must have suffered some sort of adverse employment action as a result of her failure to comply with an employer demand which conflicted with her religious beliefs. In this regard, the Court notes that in *Smith,* as well as every other case uncovered in the Court's research which involves similar facts, the plaintiff either resigned or was discharged or disciplined following his or her refusal to work on the Sabbath or to forgo church services. *See Smith,* 827 F.2d at 1084 (discharge after three unexcused Sunday absences); *see also Cooper v. Oak Rubber Co.,* 15 F.3d 1375, 1378 (6th Cir.1994) (employee who observed Saturday Sabbath resigned to avoid a tenth unexcused absence, which she claimed would have led to her "inevitable termination"); *EEOC v. Arlington Transit Mix, Inc.,* 957 F.2d 219, 221 (6th Cir.1991) (discharge for leaving the job without authorization to attend church services); *Draper v. United States Pipe & Foundry Co.,* 527 F.2d 515, 519 (6th Cir.1975) (termination following failure to report for work on four consecutive Saturdays); *Heller v. EBB Auto Co.,* 8 F.3d 1433, 1437 (9th Cir.1993) (discharge for missing a sales meeting to attend a conversion ceremony); *Mann v. Frank,* 7 F.3d 1365, 1368 (8th Cir.1993) (seven-day suspension without pay for refusal to work overtime shift on Saturday Sabbath); *Hudson v. Western Airlines, Inc.,* 851 F.2d 261, 264–65 (9th Cir.1988) (termination following refusal to work on Saturday Sabbath); *Brener v. Diagnostic Center Hosp.,* 671 F.2d 141, 144 (5th Cir.1982) (discharge after plaintiff missed work to observe Jewish holy day); *Redmond v. GAF Corp.,* 574 F.2d 897, 899 (7th Cir.1978) (discharge for refusing to work overtime on Saturday because of conflict with bible study class); *Weilert v. Health Midwest Dev. Group,* 95 F.Supp.2d 1190, 1195 (D.Kan.2000) (plaintiff nurse discharged for leaving work early to attend a religious service); *Breech v. Alabama Power Co.,* 962 F.Supp. 1447, 1452–54 (S.D.Ala.1997) (escalating discipline and discharge for refusing to work on Saturday Sabbath), *aff'd,* 140 F.3d 1043 (11th Cir. 1998); *Johnson v. Kmart Corp.,* 942 F.Supp. 1070, 1071 (W.D.Va.1996) (plaintiff resigned after employer failed to grant her request not to work on Sundays), *aff'd,* 131 F.3d 134 (4th Cir.1997); *Krushinski v. Roadway Express, Inc.,* 626 F.Supp. 472, 473 (M.D.Pa.1985) (discharge after plaintiff first exhausted his personal and sick leave, and then failed to report to work on the next Saturday Sabbath).

In this case, by contrast, Plaintiff almost entirely acceded to her employer's insistence that she work a schedule that conflicted in part with her Sabbath. It appears from the record that Plaintiff consistently appeared for work despite this conflict, with the limited exception of three weekends in February of 1997, when she used leave time to avoid working on her Sabbath.[15] By agreeing to work on her Sabbath, whether willingly or reluctantly, Plaintiff avoided suffering any adverse *employment* consequences as a result of her religious beliefs; rather, her personal religious observance suffered on account of her adherence to her work schedule. Yet, Title VII protects only the former, employment-related interests from abridgment. *See* 42 U.S.C. § 2000e–2(a) (prohibiting an employer from "disc-

---

**15.** As noted earlier, Plaintiff complains that these absences were charged as leave without pay, despite her contention that she had enough available paid leave time to cover these dates. Nevertheless, even assuming that unpaid leave could constitute the requisite "adverse employment action" under *Smith,* the Supreme Court held in *Ansonia* *Board of Educ. v. Philbrook,* 479 U.S. 60, 70–71, 107 S.Ct. 367, 373, 93 L.Ed.2d 305 (1986), that unpaid leave generally is a reasonable accommodation of an employee's religious practices, so long as the employer does not distinguish between religious and non-religious purposes in setting its policy for the use of paid or unpaid leave.

harg[ing] any individual, or otherwise ... discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion," and also from "classify[ing] his employees ... in any way which would deprive·or tend to deprive any individual of employment opportunities or·otherwise adversely affect his status as an employee, because of such individual's ... religion"). In particular, Sixth Circuit precedents require that Plaintiff must have suffered a "materially adverse" change in the terms or conditions of her employment, such as termination, demotion, decreased wages, a less distinguished·title, a material loss of benefits, or significantly diminished responsibilities. *See Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir.1999); *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 885–87 (6th Cir.1996). Mere discriminatory animus on the part of supervisors is not enough, absent some sort of materially adverse effect. *See Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 410 (6th Cir.1999); *see also Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.").

Here, the evidentiary record fails to disclose any negative impact upon a term or condition of Plaintiff's employment that might be attributable to her religious beliefs, or to her corresponding requests for a schedule that would accommodate those beliefs. To the contrary, the hospital's failure to grant Plaintiff's requests meant that there was *no* change in the terms of her employment, at least until May of 1997, and Plaintiff accepted this outcome,

regularly appearing for work despite her desire to observe her Sabbath. In essence, although Plaintiff's religious beliefs ostensibly conflicted with the demands of her job, she subordinated the former to the latter, thereby avoiding a conflict which otherwise might have led her employer to take adverse action against her. This Court does not mean to question the sincerity of Plaintiff's religious beliefs. Rather, it simply observes that Plaintiff's failure to insist upon strict adherence to these beliefs, even at the cost of negative job consequences, effectively absolved her employer of the responsibility to reasonably accommodate her beliefs. *Cf. Philbrook*, 479 U.S. at 81, 107 S.Ct. at 378 (Stevens, J., concurring in part and dissenting in part) (opining that there was no conflict between the plaintiff's religion and his employment that might give rise to a duty to accommodate, where the plaintiff was not disciplined or discharged for taking time off to observe holy days, but instead was compelled to take unpaid leave, resulting only in the "inconvenience" of "doing work on paid days that he was unable to do during his days of religious observance").

Accordingly, because Plaintiff complied with the schedule imposed by her supervisors, her employer had no occasion to penalize any non-compliance, leaving this Court with no adverse employment action to scrutinize for indicia of unlawful discriminatory animus.[16] Given this lack of evidentiary support for one of the requisite elements of Plaintiff's prima facie case, the Court finds that Defendant is entitled to summary judgment on Plaintiff's claim of religious discrimination.

**16.** Conceivably, if the VA Hospital routinely granted requests for schedule changes, this flexible scheduling could rise to the level of a "term or condition" of employment, which then could not be denied to a particular employee on the basis of her religion. *Cf. Philbrook*, 479 U.S. at 70–71, 107 S.Ct. at 372–73 (remanding for a determination whether the employer's leave policy was administered in a fashion that discriminated against religious practices). However, the record does not suggest that the hospital operated in this fashion. Moreover, it is worth noting that Plaintiff initially accepted a position at the VA Hospital with a schedule that conflicted with her Sabbath. Thus, it was she, and not her employer, who sought to change this term of her employment, and nothing in the record suggests that she was ever given any assurance that her schedule would be revisited after some initial period of employment.

### D. Plaintiff's Claim of Unlawful Harassment

Finally, Plaintiff claims that she was subjected to unlawful harassment as a result of her request for accommodation of her religious beliefs. Initially, the Court observes that this sort of "hostile work environment" claim requires a showing that Defendant took the challenged action "because of" Plaintiff's membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78–79, 118 S.Ct. 998, 1001–02, 140 L.Ed.2d 201 (1998). As discussed earlier, this causal connection can be made by pointing to other workers, similarly situated but not in the protected class, who were not subjected to the challenged treatment. Defendant has produced evidence that the write-ups and leave violations of which Plaintiff complains were part of the VA Hospital's standard operating procedures. For her part, Plaintiff has failed to produce evidence of any differential treatment under these standard procedures, beyond her subjective belief that others would not have been cited for the violations charged against her. This is not sufficient to withstand summary judgment. *See Mitchell, supra*, 964 F.2d at 585.

 However, as discussed earlier, there is no need to engage in a "similarly situated" analysis when there is direct evidence of discrimination, and Plaintiff arguably has produced such evidence in Sharon Burke–Johnson's e-mail message regarding the Sunday Sabbath. Even so, Plaintiff must identify discriminatory conduct by Johnson which was so severe or pervasive as to alter the conditions of her employment and create an abusive working environment. *See Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir.1999). Mere teasing, offhand comments, or isolated incidents, unless extremely serious, do not satisfy this standard, but only "extreme"

conduct. 183 F.3d at 512–13. Factors to consider in this inquiry include the frequency of the discriminatory conduct, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. 183 F.3d at 512.

 The conduct cited by Plaintiff is insufficient as a matter of law to show a hostile work environment that altered the conditions of her employment. Plaintiff's allegation that Johnson once called her a "bitch" is too isolated to constitute "pervasive" harassment, as is her allegation that Johnson once told her that she reviewed Plaintiff's work each night to see what she had done wrong. Next, Plaintiff's vague complaint that she occasionally was given more onerous work assignments lacks sufficient detail or support in the record to sustain a finding of an abusive work environment. Finally, the dispute regarding the proper designation of Plaintiff's time off in September of 1996 as sick leave or vacation time is an isolated incident which, again, does not establish an alteration of the terms of Plaintiff's employment.

In sum, Plaintiff has cited nothing more than a handful of more-or-less petty quarrels with Sharon Burke–Johnson, spanning over several months. This is not the sort of "extreme" or "pervasive" conduct needed to establish a hostile work environment claim under Title VII.[17] Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim of religious harassment.

### IV. CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's April 17, 2000 Motion to Dismiss or, in the Alternative, Motion for Summary Judgment is GRANTED. IT IS FURTHER ORDERED that Plaintiff's March

---

17. It also is worth noting that, as to all of the incidents identified by Plaintiff, there is no evidence which would tend to link any alleged mistreatment to Plaintiff's exercise of her religious beliefs or her requests for scheduling accommodations. At most, these incidents suggest a degree of animosity between Plaintiff and Johnson, without in any way indicating the underlying basis for this animosity.

30, 2000 motion, if construed as a motion for summary judgment, is DENIED.